August 13, 2014

Hon. James Orenstein
U.S. Magistrate Judge
United States Courthouse
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE:    *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*
        Case No. 1:13-mc-00690-JBW-JO
        Drummond Company, Inc.'s Letter Brief and Motion to Compel

Judge Orenstein:

Pursuant to this Court's Orders, Doc. 30 & Doc. 33, Drummond Company, Inc. ("Drummond") hereby submits this letter brief and moves to compel the production of documents responsive to its subpoenas to third party Parker Waichman, LLP ("PW") dated August 13, 2013 and June 12, 2014.  Doc. 8-5; Ex. 1.[1]  Drummond incorporates by reference the statement of facts in its Opposition to the Defendants' Motion for a Protective Order with respect to the background facts of this miscellaneous action.  *See* Doc. 7 at 1-10.[2]  In a nutshell, Drummond seeks evidence that Defendants paid Colombian paramilitary witnesses to testify that Drummond committed human rights violations.

On October 15, 2013, approximately two months after Drummond served its first subpoena on PW, Judge R. David Proctor in the Northern District of Alabama entered an order addressing several discovery issues in the underlying case.  Ex. 2.  Among other things, that Order held that financing documents, billing records and documents reflecting payments to witnesses are within the scope of discovery.  *Id.*  PW subsequently agreed to comply with this Order, and in March 2014, PW produced a number of documents and privilege logs in response to Drummond's first subpoena.  What those documents revealed was shocking.

The documents produced by PW strongly suggested that Mr. Collingsworth sought money to pay fact witnesses and engaged in other wrongdoing.  For example, on November 16, 2010, Mr. Collingsworth (tc@iradvocates.com) emailed Andy Alonso and Fred Rosenthal, attorneys at PW, regarding a trip to Colombia to meet with a witness on Tuesday, December 7, 2010.  *See* Principal Case Doc. 109-1.[3]  As the email reveals, Mr. Collingsworth planned to pay that witness up to $30,000 in cash, but only if he approved of the witness's testimony.  *Id.*  Mr.

---

[1] Citations to numerically designated exhibits will be to those attached to the declaration of H. Thomas Wells, III, filed contemporaneously herewith.

[2] Defendants' motion has since been mooted.  Doc. 25.

[3] Documents filed in the record in the principal case, *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, No. 2:11-cv-03695-RDP-TMP (N.D. Ala.), will be cited to where they appear in the PACER docket for that case as "Principal Case Doc. [#]."

{B1815678}

August 13, 2014
Page -2-

Collingsworth requested that $10,000 be wired to his personal account so that it could be transported to Colombia. *Id.*

Although the heading of the email references "Dole," documents produced by both PW and Defendants suggest that this money was paid to a witness in the Drummond case. Mr. Collingsworth's urgent request for a $10,000 transfer was made on November 29. The next day, PW sent Collingsworth $10,000 in the "Drummond (Rail) ATS" case. Ex. 3. The date of the meeting with the witness was December 7. Mr. Collingsworth's *Balcero*[4] billing records dated December 7, 2010 contain an 8.5 hour entry with the description "Met with FR and Ivan Otero[5]; met PRIVILEGED; NON-RESPONSIVE." Ex. 4. Defendants' privilege log entry for this billing record is described: "Time entry regarding meeting with witness." Ex. 5.

PW also produced emails discussing an "implementation plan" created by Secure Pointe Partners International, LLC ("SPPI"), a purported private investigation firm from Houston, Texas, that Collingsworth retained in *Balcero*. One of Drummond's requests to PW asks for "[a] copy of SPPI's 'implementation plan' sent to Mr. Terrence P. Collingsworth on or about October 11, 2010," Ex. 1, Req. No. 11, which Collingsworth characterized as "a plan to get us [the Defendants] necessary evidence in Colombia for all of the Colombia cases." Ex. 6. After Collingsworth emailed this "implementation plan" to lawyers at PW, those lawyers exchanged emails expressing concern about what SPPI was doing in Colombia:

> I am not a total innocent, but I am not comfortable with these bills. The supporting documentation is intel-babble, written by a non-native speaker, designed to confuse and obfuscate. Two problems are created; first, are we getting what we're paying for; second what is it we're getting anyway? ***Are we paying for buying whores for sources so that they speak to us, or are we paying for government officials to violate their trust? If the first, it's only a bit unseemly; if the second, it might be illegal.*** Only TC[6] met with these Halliburton-ish guys. Either he has to elucidate - - and maybe write us a cover-our-ass memo, or we speak to them directly. As of now? At best, too much of Carte Blanche for my taste.

Ex. 7 (emphasis added).

PW's March 2014 production also included emails discussing paying $100,000 to Jaime Blanco Maya – who Mr. Collingsworth described as the "key guy" in the cases against

---

[4] As explained in Drummond's Opposition to Defendants' Motion for a Protective Order, the *Balcero* case is one of Mr. Collingsworth's cases against Drummond that was dismissed by the Northern District of Alabama. *See* Doc. 7 at 3-4. It is currently pending on appeal in the Eleventh Circuit.

[5] "FR" is believed to be shorthand for Francisco Ramirez, Mr. Collingsworth's Colombian counsel who, as explained previously, has been involved in (at least) the payments to paramilitary Charris. Doc. 7 at 6-7. As discussed, *infra*, Ivan Otero is the Colombian criminal attorney for numerous incarcerated paramilitaries to whom Mr. Collingsworth has promised a substantial contingency fee in the Drummond cases.

[6] Presumably, "TC" is Defendant Terry Collingsworth.

August 13, 2014
Page -3-

Drummond – for his criminal legal fees.  Principal Case Docs. 101-15 & 101-17.  As Drummond recounted before Judge Proctor:

> [On April 13, 2011, a] Parker Waichman attorney asks, in regard to paying close to $100,000 for Blanco's legal fees: "If paying his legal fees is going to be disclosed at some point in his deposition (which I'm sure we can all agree it will be), would it be of any real value to our case if his credibility as a witness is significantly damaged as the payment will likely be viewed as a form of bribery?" *Id.* at PWEMAIL000066-67.

> Collingsworth responds to this question with another question: ***"As opposed to him saying Drummond had nothing at all to do with it?"*** *Id.* at PWEMAIL000066 (emphasis added).

Principal Case Doc. 104 at pp. 9-10 (quoting Principal Case Doc. 101-15).

Drummond is still investigating the issue of payment of Jaime Blanco's criminal legal fees, but what is currently known is that Ivan Otero ultimately began representing Blanco in his criminal proceeding in Colombia.  Ex. 8 at 187-188.  Ivan Otero is a Colombian criminal attorney that has represented virtually every incarcerated witness to have testified against Drummond.  *See* Principal Case Doc. 99 at 3-6.  Before any such witness ever claimed to have knowledge regarding Drummond, Mr. Collingsworth promised Otero a substantial contingency fee in his civil cases against Drummond. Principal Case Doc. 69 (Collingsworth Decl.) at ¶ 51; Ex. 9.[7]  Documents produced by PW reveal that PW funds were used to pay Otero.  Ex. 3.

In light of PW's production of documents suggesting payments to witnesses against Drummond, and because Judge Proctor's Order clarified the scope of discovery in this case, Drummond served PW with a second subpoena on June 12, 2014, which is narrowly focused on the discovery of documents already held to be within the scope of discovery by the Northern District of Alabama.  Ex. 1.  Responsive documents will show how Defendants' witness payments were described by PW, contain discussions regarding the true purpose of the payments, and shed light on the origin and ultimate recipient of the payments.  They also may reveal whether witnesses or Colombian paramilitaries received indirect payments from the Defendants, such as payments to their criminal lawyers.  In short, these documents are critically relevant to this case, as Defendants are relying on the testimony of witnesses they have paid for their defense that the defamatory letters were true.  A brief summary of the requests is below:

| Nos. 1-5, 7-18, 19-26, 28, 33-35, and 37-38 | Documents related to payments and other illicit benefits to witnesses and/or Colombian paramilitaries, as well as documents relating to Defendants' provision of "security" |
|---|---|

---

[7] Blanco initially testified before Colombian authorities under oath in September 2010 and flatly denied that Drummond used his company to funnel money to Colombian paramilitaries, stating that such a scheme was "absolutely false and accounting-wise impossible."  Ex. 10 at 6.

August 13, 2014
Page -4-

|  |  |
|---|---|
| Nos. 27, 36 | Documents related to the financing of litigation against Drummond |
| No. 29 | PW's billing records from *Balcero* |
| Nos. 30-32 | Documents related to payments to, and contingency fee agreements with, "fact" witnesses' criminal lawyers |

PW has not produced any documents in response to this subpoena, claiming that the subpoena is "over broad and not reasonably calculated to lead to the discovery of admissible evidence" or seeks documents already produced by PW.  Ex. 11.  On July 29, 2014, Drummond and PW conducted a telephonic meet and confer.  On July 31, 2014, Drummond sent PW a letter detailing the particulars of the meet and confer, offering a number of proposed limitations, and explaining the relevance of every request.  Ex. 12.  Another telephonic meet and confer was held on August 11.  Despite their good faith efforts, Drummond and PW have been unable to resolve their dispute as of the date of this filing, and thus Drummond submits this letter brief pursuant to this Court's Order.  Doc. 30.

I.   REQUESTS RELATING TO WITNESS PAYMENTS AND "SECURITY" ARE DIRECTLY RELEVANT TO THE CLAIMS AND DEFENSES IN THIS CASE.

A.   Documents relating to the fact, purpose and propriety of payments to Colombian paramilitaries and witnesses are within the scope of discovery.

Drummond's first subpoena sought documents related to payments to witnesses, and in response PW produced some documents.[8]  PW has now objected to a number of the requests in Drummond's second subpoena relating to payments to witnesses, stating that such documents "have already been produced or placed in a privilege log."  Ex. 11 at 2.[9]  PW does not dispute, however, that it did not search for documents reflecting payments to Colombian paramilitaries, which Judge Proctor has held are relevant and discoverable.  Ex. 2; Ex. 13 at 6-7.  Any documents in PW's possession discussing or relating to payments to any Colombian paramilitary should therefore be produced.  *Fincher v. Keller Indus., Inc.*, 129 F.R.D. 123, 125 (M.D.N.C. 1990) ("Even though this Court is the proper one to rule on plaintiffs' motion, it nevertheless will look at the status of the proceedings in the district where the action is pending and at

---

[8] Drummond previously briefed the relevance of witness payments before this Court.  Doc. 7 at 16-25. Since that briefing, the Northern District of Alabama has unequivocally affirmed that payments to witnesses and payments to Colombian paramilitaries are relevant and discoverable.  Ex. 2 (*Collingsworth* Doc. 64); *see also* Ex. 13 (*Balcero* Doc. 332) at 6-7.  PW has not objected to requests seeking witness payments on relevance grounds.

[9] The only requests to which PW has asserted any work product objections are Request Nos. 23-25, which seek documents and notes created during or as a result of several meetings involving PW attorneys in which witness payments were discussed.  Drummond is *not* seeking documents reflecting PW's legal conclusions and strategies. Rather, Drummond is only seeking documents relating to payments to witnesses and/or Colombian paramilitaries, which are relevant and discoverable.  Ex. 13 at 4; Ex. 14; Ex. 2.

{B1815678}

August 13, 2014
Page -5-

relevant rulings issued by that court.").[10]

Further, documents produced by other third parties raise questions regarding the scope and adequacy of PW's search for documents responsive to Drummond's first subpoena. For example, another third party witness has produced several emails amongst a group of plaintiffs' lawyers (which included PW lawyers) in June and July 2011 discussing the issue of payments to Colombian paramilitaries or their lawyers, some of which were neither produced nor logged by PW. Ex. 14.[11] Drummond has also uncovered emails directly addressed to PW lawyers relating to witness payments which were not produced or logged in response to Drummond's first subpoena. One such email, sent to PW attorneys Gary P. Falkowitz and Mike Hugo on June 8, 2011, raises concerns over Collingsworth's tainting of witnesses through payments and other improper arrangements. Ex. 15. The email was sent to Mr. Hugo's PW email address (mhugo@yourlawyer.com) and Mr. Falkowitz's PW email address (gfalkowitz@yourlawyer.com), yet it was neither logged nor produced by PW.

Furthermore, there are hundreds of thousands of dollars worth of payments that have yet to be explained. For example, documents produced by Western Union and MoneyGram *after* Drummond served its first subpoena on PW reflect that Defendants sent over $300,000 in cash to approximately 20 individuals in Colombia. Wells Decl., ¶ 3. Some of the payees are known and are either witnesses or family members of witnesses who have testified against Drummond, Doc. 7 at 5-9, but many payees are unknown and Drummond is still seeking to uncover the purpose of Defendants' payments to them. Spreadsheets produced by Mike Hugo – a former PW lawyer – show that PW almost certainly possesses documents regarding Defendants' Western Union and MoneyGram transfers that have not been produced. Ex. 16. Drummond's requests are therefore reasonably calculated to lead to evidence regarding the purpose and recipients of these substantial, unexplained cash payments.[12]

---

[10] *See also Pure Fishing, Inc. v. Redwing Tackle, Ltd.*, No. C12-0393-RSM, 2012 WL 1133384, at *3 (W.D. Wash. Apr. 4, 2012) (deferring to the forum court's discovery rulings because that court was "in the best position to determine discovery disputes between the parties because it is hearing the underlying case and is intimately familiar with the facts and issues of the dispute"); *Centrix Fin. Liquidating Trust v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 4:12-MC-624-JAR, 2013 WL 3225802, at *5 (E.D. Mo. June 25, 2013) ("Given that the Colorado court is closest to the facts of the pending adversary proceeding filed by Plaintiffs, this Court will defer to its determination of the relevance and propriety of the discovery sought in ruling on the instant motions.").

[11] The emails in Exhibits 14 and 15 were produced by a third party pursuant to a Stipulated Protective Order in the underlying case, Principal Case Doc. 127, and thus Drummond is filing them under seal in compliance with that Order.

[12] In its July 10, 2014 Letter setting forth its objections to Drummond's subpoena, PW suggested that "the requested documents [are available] from named parties in this litigation." Ex. 11 at 2. First, the Northern District of Alabama recently made it clear that "[t]here's no such thing as duplication of discovery in this case. Any source that may have a document is fair game." The Court explained that this ruling was precipitated by the fact that third parties – including PW – have produced numerous documents that were neither logged nor produced by the Defendants. Ex. 17 (Apr. 21, 2014 Hrg. Tr.) at 8:4-20. Indeed, some of the most troubling examples of Defendants' nonproduction are documents produced by PW in response to Drummond's first subpoena. *See* pages 1-3, *supra*. Notably, while he felt it was premature to immediately order Defendants' hard drives to be forensically analyzed due to their failure to produce documents that were produced pursuant to Drummond's third-party subpoenas, Judge Proctor ordered Defendants to "maintain and preserve all hard drives and email accounts, in their present form,

{B1815678}

August 13, 2014
Page -6-

### B.   Documents relating to "security" provided to witnesses are crucial, and Drummond's requests are narrowly tailored to discover such documents.

The Defendants' stated justification for their witness payments is also important to bear in mind when analyzing whether Drummond's requests are reasonably calculated to lead to the discovery of admissible evidence.  In particular, Defendants claim that their witness payments were for "security" necessitated by threats purportedly received by the witnesses.  Drummond, of course, disputes Defendants' story, which is belied by a host of documents surrounding the payments.  *See* Doc. 7 at 5-10; pages 1-3, *supra*.  Importantly, PW stated during the meet and confer process that it did not interpret Drummond's first subpoena to ask for documents and communications relating to the provision of "security" to witnesses, and thus did not search for any such documents.  Documents relating to the provision of "security" for any Drummond witness, especially those whom Collingsworth has admitted to paying, are directly relevant to the purpose of the payments.   As an entity that provided hundreds of thousands of dollars in financing to Collingsworth, thereby allowing him to prosecute his lawsuits against Drummond, PW likely possesses documents directly relevant to the purpose and fact of Mr. Collingsworth's witness payments, including whether they were actually used for "security."

### C.   Defendants' payments to, and contingency fee agreements with, Colombian paramilitaries' criminal lawyers are relevant and discoverable.

Through discovery in this case, Drummond learned that Defendants have a contingency fee agreement with Ivan Otero, a Colombian criminal lawyer who represented many of the Colombian paramilitary "fact" witnesses who testified against Drummond in *Balcero*.  Principal Case Doc. 69 (Collingsworth Decl.) ¶ 51.  That agreement entitles Otero to a contingency fee in a civil case in which his criminal clients are supposed to be testifying as impartial "fact" witnesses.  A third party produced a written agreement between Mr. Collingsworth and Otero which states that, in addition to a contingency fee, Otero was to receive an immediate payment of $80,000 to be used for "investigation" and "security" in *Balcero*.  Ex. 9.   After this written agreement was revealed, however, Defendants quickly claimed that it was "immediately voided," although they have never produced any documents to that effect.

Request Nos. 30-32 seek documents relating to contingency fee agreements with, and documents showing payments to, Colombian lawyers.  As explained above, there is substantial evidence of Mr. Collingsworth seeking to provide benefits to paramilitary witnesses through the payment of their Colombian criminal lawyers.  Documents relating to this issue are discoverable

---

which have been utilized by Defendants' litigation team during their entire pursuit of litigation against Drummond until further direction of this court." Ex. 18 (Apr. 3, 2014 Text Order); *see also* Ex. 17 (Apr. 21, 2014 Hrg. Tr.) at 19:6-18.

Moreover, PW *does* possess discoverable documents that are not available from the Defendants – a fact that is reflected by documents PW produced in response to Drummond's first subpoena.  For example, as explained *supra*, PW produced internal emails amongst PW lawyers questioning whether Defendants were utilizing SPPI to pay for "whores" for sources and bribing government officials to "violate their trust."  Ex. 7; *see also* Ex. 15.  Such documents are critically relevant to the central issues in this case, and are likely not in the Defendants' possession.

{B1815678}

August 13, 2014
Page -7-

because they bear on whether Mr. Collingsworth reasonably believed the testimony of the witnesses he relies upon to support the truth of his defamatory letters. Additionally, they may reflect indirect payments to witnesses who no longer have to pay their criminal legal fees.

## II.   PW'S FINANCING DOCUMENTS AND BILLING RECORDS ARE DISCOVERABLE.

The Northern District of Alabama has already held that documents relating to the financing of Defendants' litigation against Drummond "are not overbroad and are properly within the scope of discovery to the extent that the requests involve **who** financing was sought from, **what** payments were received, **how** the need for money was characterized, what the **terms** of the financing were, and information on **actual money advanced or loaned or provided to prosecute the actions**." Ex. 2 at 2-3. Consistent with this Order, Request Nos. 27 and 36 seek documents that will reflect "money advanced or loaned or provided to prosecute" Defendants' cases against Drummond, as well as documents showing how money was used and how the need for the funds was characterized. These requests are neither overbroad nor irrelevant. As outlined above, some of the limited financing documents produced to date by PW have already led to the discovery of additional witness payments.

PW also objects to Request No. 29, which seeks PW's billing records and time sheets from *Balcero*, as "over broad and not calculated to lead to the discovery of admissible evidence." Ex. 11 at 3. But Judge Proctor has already held that "requests for production concerning **billing records** are not overbroad and are properly within the scope of discovery." Ex. 2 at 2. As Defendants' co-counsel in *Balcero*, PW's billing and time sheets are properly subject to discovery.

## III.   PW'S ARGUMENTS REGARDING THE BURDEN AND COST OF RESPONDING TO DRUMMOND'S SUBPOENA ARE UNAVAILING.

During the meet and confer process, PW made it clear that its primary objection to the second subpoena related to the cost of compliance, citing the general proposition embodied in Fed. R. Civ. P. 45(d)(1) that courts should protect third parties from responding to unduly burdensome subpoenas. In response, Drummond offered a number of compromises, including having its counsel travel to New York to physically inspect and review all responsive documents gathered by PW, as well as offering to pay for a portion of the reasonable costs incurred by PW in responding to the subpoena. Despite their good faith efforts, the parties have been unable to reach an agreement regarding the payment of PW's costs in responding to Drummond's subpoena. Drummond's offers were more than reasonable, as PW is "no ordinary, unrelated non-party witness." *Chevron Corp. v. Donziger*, No. 11-civ-0691(LAK), 2013 WL 1087236, at *32-33 (S.D.N.Y. Mar. 15, 2013) (denying a request for reimbursement of costs incurred in responding to Chevron's subpoena where the third party was "an alleged co-conspirator and some of its actions are at issue in this case"). Indeed, PW was co-counsel with Defendants and had a direct financial interest in a case where Defendants paid over $100,000 to witnesses who testified against Drummond. Documents discovered to date suggest that PW was the source of at least some of this money. Under these circumstances, it is appropriate for PW to pay for the cost

August 13, 2014
Page -8-

of complying with the subpoena.[13]

## IV.   DOCUMENTS WITHHELD BY PW ON A CLAIM OF ATTORNEY-CLIENT PRIVILEGE OR WORK-PRODUCT SHOULD BE SUBMITTED TO THE SPECIAL MASTER FOR REVIEW.

PW withheld a number of documents responsive to Drummond's first subpoena on a claim of work-product or attorney-client privilege.  Drummond requests that PW be ordered to produce unredacted copies of those documents to Special Master T. Michael Brown, who is presiding over all discovery disputes in the underlying case and has already been tasked with conducting an *in camera* review of documents withheld by the Defendants on a claim of work-product or attorney-client privilege.  Ex. 19.  The Special Master is intimately familiar with the facts of this case, the legal arguments of the parties, and the Northern District of Alabama's prior discovery rulings.  Drummond respectfully submits that allowing him to conduct this *in camera* review will save both PW and this Court time and resources.

Alternatively, Drummond requests that this Court review those documents *in camera* to determine whether PW's privilege and work-product claims are tenable.  *See In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386-87 (2d Cir. 2003) (collecting cases and holding that *in camera* review is "a practice both long-standing and routine in cases involving privilege").

Respectfully submitted,

By: *s/ H. Thomas Wells, III*
H. Thomas Wells, III, Esq.
STARNES DAVIS FLORIE, LLP
P.O. Box 59812
Birmingham, Alabama 35259
Tel:  (205) 868-6000
Fax:  (205) 868-6099
E-mail:  htw@starneslaw.com
*Attorney for Drummond Company, Inc.*

Cc:  Counsel of record

---

[13] *See also In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) ("Where a non-party was 'substantially involved' in the underlying transaction and could have anticipated that [the transaction would] reasonably spawn some litigation,' expenses should not be awarded.") (citation omitted); *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 87 (D. Mass. 2008) (denying a third party's requests for reimbursement of its costs in responding to a subpoena where "it is clear that Greater Media has an interest in the outcome of this litigation. Greater Media was involved in a transaction with Comcast and could have anticipated such a transaction could potentially spawn litigation or discovery.").